*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0470**

State of Minnesota,
Respondent,

vs.

Brandon Allen Linscheid,
Appellant.

**Filed February 27, 2017
Affirmed
Stauber, Judge**

Cottonwood County District Court
File No. 17-CR-15-341

Lori Swanson, Attorney General, James B. Early, Assistant Attorney General, St. Paul, Minnesota; and

Nicholas Anderson, Cottonwood County Attorney, Windom, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Sara L. Martin, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Bratvold, Presiding Judge; Worke, Judge; and Stauber, Judge.

**U N P U B L I S H E D   O P I N I O N**

**STAUBER**, Judge

Appellant seeks reversal of his two controlled-substance convictions, arguing that:

(1) the evidence was insufficient to show that he conspired with another to sell

methamphetamine for purposes of proving his conviction of second-degree controlled-substance crime (sale) and (2) the testimony of a confidential informant could not be used as corroborating evidence to support either the second-degree conviction or a separate third-degree controlled-substance conviction because the confidential informant was purportedly an accomplice in those crimes. We affirm.

## FACTS

Following a two-day trial, a jury convicted appellant Brandon Allen Linscheid of two controlled-substance offenses: second-degree controlled-substance crime (sale), and third-degree controlled-substance crime (sale). Both offenses occurred in May 2015 and involved two controlled buys that were facilitated by a confidential informant, S.B. In May 2015, S.B. was a high-school-aged methamphetamine addict who had agreed to become an informant while he was serving jail time on a probation violation for a separate controlled-substance offense. S.B. was a friend and schoolmate of 18-year-old A.M., and A.M. was 31-year-old appellant's girlfriend. S.B. and A.M. testified for the state at trial and established the circumstances surrounding the two controlled buys that involved appellant.

## I. S.B.'s testimony.

S.B. testified that, in May 2015, appellant was living with A.M. and her mother in an apartment complex. On May 6, S.B. went to A.M.'s apartment to hang out. While A.M. was not in the room, S.B. asked appellant if he could "buy some meth off of him," specifically, a "teener," which is 1.7 grams of methamphetamine. According to S.B., appellant said, "Yeah, I know where to get some," and they discussed "prices, amounts,

2

[and] things of that nature," and appellant told S.B. that he could "get [in] contact [with] him by just stopping by or talking to [A.M.]." After properly setting up the buy with law enforcement and receiving $100 in a marked bill, S.B. contacted A.M., was dropped off near A.M.'s car (in which appellant was a passenger), gave appellant and A.M. the $100, and was told that it would take them about 45 minutes to obtain the methamphetamine from Worthington.

During school the next day, A.M. and S.B. agreed to transfer the methamphetamine after school. S.B. went to A.M.'s apartment after school, and while appellant was in the background, A.M. handed him a baggie of methamphetamine, which completed the first transaction.

Next, according to S.B., on May 27, 2015, S.B. asked A.M. if he could buy an "eight-ball," or 3.5 grams of methamphetamine, and she initially "said she had somebody that could get it" but then later "said that that person couldn't get it and she was gonna ask [appellant] for it after he got off work."[1] Later that day, S.B. gave A.M. $350 in marked bills that he had received from law enforcement, and A.M. told S.B. that she would contact him when appellant got off work. Later, S.B. stopped at a shop at the Windom Apartments where A.M. and appellant were "sitting around smoking" methamphetamine and asked appellant about the "ball [he] was supposed to get." Appellant told him that the sale was "all messed up," but that he would get the methamphetamine "even if [he had] to do it in little bits at a time." S.B. secretly took

---

[1] During S.B.'s testimony, the district court admitted evidence of texts pertaining to this transaction from A.M.'s and S.B.'s phones.

3

some photos of the shop with his phone. On the 27th, S.B. did not receive any methamphetamine from A.M. or appellant, but he smoked methamphetamine with them, even though he was forbidden to do so as a confidential informant. He explained that he did so to discourage them from suspecting that he was "a snitch or a CI or something." S.B. never received the eight-ball from appellant.

## II.    A.M.'s testimony.

A.M. testified that she was a methamphetamine addict who was testifying in accordance with the terms of her plea agreement for a third-degree controlled-substance (sales) conviction for the May 7, 2015 transaction with S.B. A.M. further testified that she and S.B. were friends and that she had begun dating appellant in October of 2014. She also testified that when appellant moved into her home, he brought a small scale.

As to the May 6-7 drug sale, A.M. testified that, before the sale, appellant had agreed to sell methamphetamine to S.B. and had received a marked $100 from S.B. to complete the sale. The methamphetamine for S.B. came from appellant, who instructed her to "give it to [S.B.] when he came to the door." She also testified that the methamphetamine they sold to S.B. as weighing 1.7 grams actually weighed only one gram because she and appellant had used some of it earlier that day.

As to the May 27 transaction, A.M. testified that appellant told her to get $350 from S.B. for an eight-ball. Because "wanting that much was kind of suspicious," A.M. and appellant agreed "that we were gonna just keep the money and not get him any drugs." S.B. came to A.M.'s home to give her the money on the 27th, and she gave the money to appellant. According to A.M., appellant told S.B. that "it would take a couple

4

times to get it right with the ball," but he never told S.B. that he was not going to complete the sale. A few days later, on May 31, 2015, A.M. and appellant met S.B. in the shop area of her apartment building, and she verified that photos S.B. took at that time were of appellant's hands, among other things. She further testified that after she pleaded guilty subject to a plea agreement, she entered an in-patient treatment program, but was later dismissed when she twice had prohibited phone contact with appellant. She testified that appellant instructed her to testify at trial that he had no part in selling drugs to S.B., and that she had made the sales "because [S.B.] was [her] friend."

On cross-examination, A.M. admitted that there were discrepancies in her testimony and previous statements about whether appellant or she took the $100 from S.B. for the first sale. She also admitted that on May 31, she heard screaming and yelling as she came out of her apartment and saw that S.B. "had a baseball bat," and he and another man were threatening appellant. She told them to leave, and they did.

On this evidence, the jury convicted appellant of both offenses. At sentencing, the district court vacated the third-degree conviction and imposed a 78-month executed sentence on the remaining offense. This appeal followed.

**D E C I S I O N**

**I.    Sufficiency of evidence.**

Appellant argues that the evidence was insufficient to prove that he was a party to a conspiracy to sell methamphetamine to S.B. for purposes of convicting him of the second-degree offense. Generally, "[w]hen reviewing sufficiency of evidence, [an appellate court] inquire[s] whether, given the facts in the record and any legitimate

5

inferences that can be drawn from those facts, a jury could reasonably find that the defendant was guilty of the charged offense." *State v. Young*, 710 N.W.2d 272, 278 (Minn. 2006) (quotation omitted). In making this inquiry, the appellate court "view[s] the evidence in the light most favorable to the verdict." *Id.* When a conviction depends on circumstantial evidence, the reviewing court applies the following two-step analysis:

> The first step is to identify the circumstances proved. In identifying the circumstances proved, we defer to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State. . . .
>
> The second step is to determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt. We review the circumstantial evidence not as isolated facts, but as a whole. We examine independently the reasonableness of all inferences that might be drawn from the circumstances proved; including the inferences consistent with a hypothesis other than guilt. Under this second step, we must determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypotheses except that of guilt, not simply whether the inferences that point to guilt are reasonable. We give no deference to the fact finder's choice between reasonable inferences.

*State v. Silvernail*, 831 N.W.2d 594, 598-99 (Minn. 2013) (quotations and citations omitted); *see State v. Robertson*, 884 N.W.2d 864, 871 (Minn. 2016) (reiterating and applying two-step test).

Second-degree controlled-substance crime is defined as "on one or more occasions within a 90-day period the person unlawfully sells one or more mixtures of a total weight of three grams or more containing . . . methamphetamine." Minn. Stat. § 152.022, subd. 1(1) (2014). Appellant could be convicted of this crime if he "conspire[d] with another to

commit a crime and in furtherance of the conspiracy one or more of the parties [did] some overt act in furtherance of such conspiracy." Minn. Stat. § 609.175, subd. 2 (2014). With regard to the various actions taken by co-conspirators,

> Everything said, written, or done by a conspirator in the execution or furtherance of the common purpose to commit a crime is deemed to be the act of every party to the conspiracy . . . and is admissible as evidence against each of them. The combination need not be established by direct proof.

*State v. Jenkins*, 411 N.W.2d 504, 508 (Minn. App. 1987) (quotation omitted).

Appellant argues that there is insufficient evidence to establish that he and A.M. "entered into an agreement . . . to sell methamphetamine to S.B." He asserts that the evidence of a conspiracy is lacking because it does not establish that they ever intended or agreed to commit a drug crime—the evidence shows only that they intended to keep S.B.'s $350. "[B]oth knowledge of an agreement and evidence of intent to commit the crime or act that is the object of the conspiracy" must be shown. *State v. Kuhnau*, 622 N.W.2d 552, 556 (Minn. 2001); *see State v. Burns*, 215 Minn. 182, 186, 9 N.W.2d 518, 520 (1943) (requiring "common object" of conspiracy to commit the criminal offense that is the "object" of the conspiracy); *see also State v. Hatfield*, 639 N.W.2d 372, 376 (Minn. 2002) (stating that agreement to conspire "must be shown by evidence that objectively indicates an agreement").

The state produced no direct evidence to establish that A.M. and appellant intended to procure three or more grams of methamphetamine to sell to S.B. Their only testimony on that point was that they had decided not to sell an eight-ball to S.B. But although "mere association with a person engaged in illegal activity does not make a

7

person a conspirator," an agreement to engage in a conspiracy may be inferred. *State v. Pinkerton*, 628 N.W.2d 159, 163-64 (Minn. App. 2001), *review denied* (Minn. July 24, 2001); *see Burns*, 215 Minn. at 189, 9 N.W.2d at 522 (allowing conspiracy to be inferred from the circumstances, such as when "several persons commit separate acts which form parts of a connected whole").

The state proved the following: (1) appellant brought a scale when he moved into A.M.'s home; (2) within the same month, appellant and A.M. cooperated in selling one gram of methamphetamine to S.B.; (3) A.M. next agreed to sell S.B. an eight-ball; (4) A.M. could not arrange for the sale through other providers; (5) A.M. approached appellant about selling an eight-ball to S.B.; (6) A.M. told S.B. that she and appellant agreed to sell S.B. an eight-ball; (7) S.B. gave A.M. $350; (8) when S.B. did not receive the eight-ball, he inquired of appellant and A.M., and was told by appellant that he would receive the total amount agreed to, but in smaller increments. These actions are sufficient to circumstantially prove that appellant and A.M. conspired to sell S.B. three grams or more of methamphetamine.

The pivotal evidence in determining the sufficiency of evidence of the conspiracy is the weight to be given to appellant's and A.M.'s testimony that they had agreed to keep S.B.'s money but not complete the sale. Although it would be sufficient to establish a conspiracy to steal money from S.B., this testimony, if credited fully, could have created reasonable doubt that appellant and A.M. conspired to commit a controlled-substance offense. But consistent with *Silvernail*, this court must defer to the jury's rejection of evidence that conflicted with the circumstances proved by the state. 831 N.W.2d at 599.

8

Given the jury's verdict that appellant and A.M. conspired to commit a second-degree controlled-substance crime, the jury necessarily rejected appellant's and A.M.'s testimony that they did not intend to sell the eight-ball of methamphetamine to S.B. For this reason, appellant's argument fails under the first step of *Silvernail*.

Further, in order to reverse a conviction based on circumstantial evidence, the reviewing court must consider "whether the reasonable inferences that can be drawn from the circumstances proved support a rational hypothesis other than guilt." *State v. Stein*, 776 N.W.2d 709, 714 (Minn. 2010); *Silvernail*, 831 N.W.2d at 599. Under the second *Silvernail* step, while it is theoretically possible for a jury to have believed A.M.'s and appellant's testimony that they did not intend to complete the sale, it would have been unreasonable to do so. S.B. and A.M. were friends who lived in a small town, and the parties had engaged in a drug transaction earlier that month. It is also unreasonable to infer that S.B. would have acquiesced to paying $350 and receiving nothing. *See State v. Scanlon*, 719 N.W.2d 674, 688 (Minn. 2006) (affirming conviction on circumstantial evidence, and rejecting possible "scenarios [that] stretch the concept of 'rational hypothesis' to absurd limits"); *c.f. State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989) (stating that the jury is best able to weigh conflicting evidence).

Applying *Silvernail*, we conclude that the jury did not credit appellant's or A.M.'s testimony that they did not intend to sell an eight-ball of methamphetamine to S.B., and that the evidence credited by the jury could only rationally lead to an inference of guilt. The circumstantial evidence is therefore sufficient to sustain appellant's conviction of conspiracy to commit second-degree controlled-substance crime.

9

## II.  S.B. an Accomplice.

Appellant also argues that S.B. was an accomplice to his crimes because he deviated from police protocols by ingesting methamphetamine while he was acting as a confidential informant and by threatening appellant with a baseball bat after he did not receive the methamphetamine promised in the drug transaction.

"A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense."  Minn. Stat. § 634.04 (2014).  "Our case law defines an accomplice as one who has been or who could be convicted of the same offense with which the defendant has been charged."  *State v. Houle*, 257 N.W.2d 320, 324 (Minn. 1977).

The jury had the duty to weigh to S.B.'s credibility as a witness, including considering whether his conduct of ingesting methamphetamine while he was a confidential informant and threatening appellant with a baseball bat made his testimony not credible.  *See Pinkerton*, 628 N.W.2d at 162 ("[I]t is the function of a jury to weigh the credibility of witnesses.").  Although S.B. admittedly ingested methamphetamine with A.M. and appellant on one occasion in May 2015, this conduct did not make him an accomplice to the offenses of selling methamphetamine or conspiring to sell methamphetamine.  *See State v. Swyningan*, 304 Minn. 552, 556, 229 N.W.2d 29, 32 (1975) (stating that "one who receives heroin cannot be an accomplice of a person charged with distributing heroin"); *see also Pinkerton*, 628 N.W.2d at 163 (stating that "an agreement solely between a seller and a buyer of controlled substances cannot constitute a conspiracy").  Further, S.B.'s conduct of threatening appellant with a baseball

bat did not make him an accomplice to appellant's crimes: that conduct was in direct opposition to appellant's criminal interests. Because S.B. was not an accomplice to appellant's crimes, his testimony could be used to corroborate A.M.'s testimony.

**Affirmed**.